# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 23, 2013 — Decided April 19, 2013

No. 11-7096

DAVID L. DE CSEPEL, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLANTS/CROSS-APPELLEES

Consolidated with 12-7025, 12-7026

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

*Thaddeus J. Stauber* argued the cause for appellants/cross-appellees. With him on the briefs were *D. Grayson Yeargin* and *Sarah E. André. David D. West* entered an appearance.

*Michael S. Shuster* argued the cause for appellees/cross-appellants. With him on the briefs were *Dorit Ungar Black*, *Sheron Korpus*, *Alycia Regan Benenati*, *Michael D. Hays*, and *Daniel D. Prichard. Agnes Peresztegi* and *Alyssa T. Saunders* entered appearances.

Before: TATEL, *Circuit Judge*, WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: As part of the wholesale plunder of Jewish property carried out during the Holocaust, the Hungarian government, acting in collaboration with Nazi Germany, confiscated the "Herzog Collection"—one of Europe's largest and finest private art collections. Plaintiffs, descendants of the Collection's owner, claim that following World War II the Hungarian government entered into bailment agreements with them to retain possession of the Collection and later breached those agreements by refusing to return the artwork. Finding Hungary's bevy of arguments in support of dismissal unpersuasive, we affirm the district court's partial denial of its motion to dismiss. But because we agree with plaintiffs that the district court prematurely dismissed several of their claims on international comity grounds, we reverse that portion of the decision.

**I.**

Baron Mór Lipót Herzog was a "passionate Jewish art collector in pre-war Hungary" who assembled a collection of more than two thousand paintings, sculptures, and other artworks. Compl. ¶ 38; *see Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (in reviewing district court's ruling on motion to dismiss, we accept the complaint's allegations as true). Known as the "Herzog Collection," this body of artwork was "one of Europe's great private collections of art, and the largest in Hungary," and included works by renowned artists such as El Greco, Diego Velázquez, Pierre-Auguste Renoir, and Claude Monet. Compl. ¶ 38. Following Herzog's death in 1934 and

his wife's shortly thereafter, their daughter Erzsébet and two sons István and András inherited the Collection. *Id.* ¶ 39.

Then came World War II, and Hungary joined the Axis Powers. In March 1944, Adolf Hitler sent German troops into Hungary, and SS Commander Adolf Eichmann entered the country along with the occupying forces and established headquarters at the Majestic Hotel in Budapest. *Id.* ¶¶ 51, 60. During this time, Hungarian Jews were subjected to anti-Semitic laws restricting their economic and cultural participation in Hungarian society and deported to German concentration camps. *Id.* ¶¶ 44, 47, 52. As an integral part of its oppression of Hungarian Jews, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets." *Id.* ¶ 54. Jews "were required to register all of their property and valuables" in excess of a certain value, and the Hungarian government "inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews." *Id.* ¶ 55. "[P]articularly concerned with the retention of artistic treasures belonging to Jews," the Hungarian government established "a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews . . . and required Hungarian Jews promptly to register all art objects in their possession." *Id.* ¶ 56. "These art treasures were sequestered and collected centrally by the Commission for Art Objects," headed by the director of the Hungarian Museum of Fine Arts. *Id.*

In response to widespread looting of Jewish property, the Herzogs "attempted to save their art works from damage and confiscation by hiding the bulk of [them] in the cellar of one of the family's factories at Budafok." *Id.* ¶ 58. Despite these efforts, "the Hungarian government and their Nazi[]

collaborators discovered the hiding place" and confiscated the artworks. *Id.* ¶ 59. They were "taken directly to Adolf Eichmann's headquarters at the Majestic Hotel in Budapest for his inspection," where he "selected many of the best pieces of the Herzog Collection" for display near Gestapo headquarters and for eventual transport to Germany. *Id.* ¶ 60. "The remainder was handed over by the Hungarian government to the Museum of Fine Arts for safekeeping." *Id.* After seizure of the Collection, a pro-Nazi newspaper ran an article in which the director of the Hungarian Museum of Fine Arts boasted that "[t]he Mór Herzog collection contains treasures the artistic value of which exceeds that of any similar collection in the country. . . . If the state now takes over these treasures, the Museum of Fine Arts will become a collection ranking just behind Madrid." *Id.* ¶ 59.

"Fearing for their lives, and stripped of their property and livelihoods, the Herzog family was forced to flee Hungary or face extermination." *Id.* ¶ 63. Erzsébet Herzog (Erzsébet Weiss de Csepel following her marriage) fled Hungary with her children, first reaching Portugal and eventually settling in the United States, where she became a U.S. citizen in 1952. *Id.* István Herzog was nearly sent to Auschwitz but "escaped after his former sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of the Spanish Embassy." *Id.* ¶ 42. Several members of his family escaped to Switzerland while others remained in Hungary. *Id.* ¶ 64. István Herzog died in 1966, leaving his estate to his two sons, Stephan and Péter Herzog, and his second wife, Mária Bertalanffy. *Id.* ¶ 42. András Herzog was "sent . . . into forced labor in 1942 and he died on the Eastern Front in 1943." *Id.* ¶ 41. His daughters, Julia Alice Herzog and Angela Maria Herzog, fled to Argentina and eventually settled in Italy. *Id.* ¶ 64.

Following the end of World War II, the Herzog family began a seven-decade struggle to reclaim the Collection. The complaint alleges that, "[u]pon information and belief," some pieces of the Herzog Collection remained in Hungary after the war, while others were shipped to Germany or elsewhere. *Id.* ¶¶ 60–62. As to the artwork remaining in Hungary, "at least forty works of art . . . are known to be in the . . . possession of the Museum of Fine Arts (Szépmüvészeti Múzeum), Budapest, the Hungarian National Gallery, and the Museum of Applied Arts, Budapest . . ., as well as the Budapest University of Technology and Economics." *Id.* ¶ 2. According to the complaint, several of these pieces "were being openly exhibited" on the walls of these museums with "tags under the paintings identif[ying] them as 'From the Herzog Collection.' " *Id.* ¶ 77.

During the Communist era, which began in the late 1940s, "little information could be obtained about the state of the Herzog Collection." *Id.* ¶ 75. After the fall of Communism in 1989, Erzsébet Weiss de Csepel, then 89 years old, began negotiations with the Hungarian government for return of the Herzog Collection. *Id.* ¶ 78. Weiss de Csepel, however, was only able to obtain seven pieces of lesser value, and "[t]he identifiable masterworks remained in the Museum of Fine Arts and the Hungarian National Gallery." *Id.* Following Weiss de Csepel's death in 1992, her daughter, Martha Nierenberg, continued negotiating with the Hungarian government for return of the artwork. *Id.* ¶ 79.

In 1999, Martha Nierenberg, seeking return of twelve pieces of the Herzog Collection, filed suit in Hungary. *See de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 125 (D.D.C. 2011) (discussing the Hungarian litigation). Shortly after that litigation began, the Museum of Fine Arts returned one painting to her without explanation. *Id.* Other members of

the Herzog family—András's daughters Angela and Julia Herzog, as well as István's sons—later intervened as defendants due to a dispute, now resolved, about which members of the Herzog family owned certain pieces of the Collection. *Id.* The Budapest Metropolitan Court initially found in Martha Nierenberg's favor, ordering that all but one of the paintings be returned to her. *Id.* at 126. After several appeals and many more years of litigation, however, the Metropolitan Appellate Court ultimately dismissed the action in 2008. As the district court here explained, the Metropolitan Appellate Court held that "Ms. Nierenberg's claim had been extinguished by [an executive agreement settling certain claims by U.S. nationals against Hungary], and that additional defendants had acquired title through adverse possession." *Id.* at 145.

On July 27, 2010, several members of the Herzog family filed this suit in the United States District Court for the District of Columbia against the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics (collectively "Hungary"), asserting claims for bailment, conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment. Plaintiffs are David L. de Csepel, a United States citizen who is the grandson of the late Erzsébet Weiss de Csepel, and Angela Maria and Julia Alice Herzog, Italian citizens who are the daughters of the late András Herzog (collectively "the Herzog family"). *Id.* ¶¶ 6–8. Having "authority to represent all of the Herzog Heirs in this action," *id.*, plaintiffs seek the return of "at least forty works of art" from the original Herzog Collection still allegedly in Hungary's possession, *id.* ¶ 2. Their primary claim is one for bailment. Specifically, they allege that "[i]n the years immediately following [World War II], the Museums and the

University, acting at Hungary's direction, became custodians of artworks" that had been looted during the war and "arranged with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection . . . so that the works could continue to be displayed in Hungary." *Id.* ¶ 36. According to the family, this arrangement gave rise to a bailment agreement, whereby Hungary assumed "a duty of care to protect the property and to return it to [the Herzog family]" upon their demand. *Id.* ¶ 101. The family claims that Hungary breached these duties in 2008 when it refused their demand to return the Herzog Collection. *Id.* ¶ 104.

Hungary moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the district court lacked jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq., that the complaint failed to state a claim for bailment, and that the family's claims were barred by the FSIA's "treaty exception," the applicable statute of limitations, the political question doctrine, the act of state doctrine, and the doctrines of forum non conveniens and international comity.

The district court granted the motion in part and denied it in part. Invoking the doctrine of international comity, the court dismissed the family's claims to the eleven pieces of artwork at issue in the Nierenberg litigation. *de Csepel*, 808 F. Supp. 2d at 144–45. In all other respects, the district court denied the motion to dismiss. *Id.* at 145. The court also certified its order for immediate appeal pursuant to 28 U.S.C. § 1292(b).

Hungary now appeals the partial denial of its motion to dismiss, reiterating many of the arguments it made in the district court. The Herzog family cross-appeals the dismissal of their claims to eleven pieces of artwork on international

comity grounds. Unless specified otherwise, our review is de novo. *See Owens v. Republic of Sudan*, 531 F.3d 884, 887 (D.C. Cir. 2008) (denial of foreign sovereign's motion to dismiss for lack of subject matter jurisdiction is reviewed de novo); *Bombardier Corp. v. Nat'l Railroad Passenger Corp.*, 333 F.3d 250, 252 (D.C. Cir. 2003) (denial of motion to dismiss under Rule 12(b)(6) is reviewed de novo). Moreover, and critical to many of the issues before us, in reviewing the district court's denial of Hungary's motion to dismiss for failure to state a claim under Rule 12(b)(6), "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted).

## II.

We begin with Hungary's appeal of the district court's partial denial of its motion to dismiss.

## A.

Hungary first contends that the district court lacked subject matter jurisdiction under the FSIA. Under that statute, "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of several enumerated exceptions applies. 28 U.S.C. § 1604. The Herzog family invokes the statute's "expropriation" and "commercial activity" exceptions. *See id.* § 1605(a)(3), 1605(a)(2). Because Hungary "challenges only the legal sufficiency of the [family's] jurisdictional allegations," we "take the [family's] factual allegations as true and determine whether they bring the case within" either of these exceptions. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

The district court found it had jurisdiction under the expropriation exception, which abrogates sovereign immunity in any case where "rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). Although agreeing with Hungary that "a state's taking of the property of its own citizens, no matter how egregious, does not constitute an international law violation," the district court nonetheless found that this principle posed no bar to application of the expropriation exception because "Hungary did not consider Ms. Nierenberg and Ms. Weiss de Csepel to be Hungarian citizens at the time of the seizures." *de Csepel*, 808 F. Supp. 2d at 129–30. Pointing to the host of "anti-Semitic laws passed by Hungary during World War II," the district court concluded that the country had "*de facto* stripped [Ms. Nierenberg], Ms. Weiss de Csepel, and all Hungarian Jews of their citizenship rights" and that "the alleged Hungarian 'citizenship' of plaintiffs' predecessors" thus did "not preclude the application of the expropriation exception in this case." *Id.* at 130. Moreover, the district court reasoned, even if "the seizure of the Herzog Collection by Hungary alone would not constitute a violation of international law," the Herzog family's allegations regarding "the active involvement of German Nazi officials in the taking of at least a portion of the Herzog Collection" distinguished this case from one where a sovereign acting alone confiscates its own nationals' property. *Id.*

Of course, we have no quarrel with the historical underpinnings of the district court's analysis. During World War II, the Hungarian government did indeed enact a series of anti-Semitic laws "designed to exclude Jews from meaningful roles in Hungarian society." Compl. ¶ 44. This exclusion was both symbolic, through the requirement that Jews "wear distinctive signs identifying themselves as Jewish," *de Csepel*, 808 F. Supp. 2d at 129, and physical, through expulsion "to

territories under German control where they were mistreated and massacred," Compl. ¶ 49. According to the complaint, moreover, the Hungarian government did not act alone when it seized the Herzog Collection. Instead, it was "the Hungarian government and their Nazi[] collaborators" that "discovered the hiding place" of the Herzog Collection and confiscated the artwork, acting "as part of a brutal campaign of genocide" against Hungarian Jews. Compl. ¶¶ 1, 59.

In their complaint, however, the Herzog family seeks to recover not for the original expropriation of the Collection, but rather for the subsequent breaches of bailment agreements they say they entered into with Hungary. Specifically, the complaint alleges that Hungary's "possession or re-possession of any portion of the Herzog Collection following [World War II] constituted an express or implied-in-fact bailment contract," under which Hungary assumed "a duty of care to protect the property and to return it to [the Herzog family]," and which Hungary breached by refusing to return the Collection in 2008. *Id.* ¶¶ 100–01, 104. The family's claims, they reiterate, are nothing "more than straightforward bailment claims that are cognizable in a United States court." Appellees' Br. 26. Indeed, every one of their other substantive claims—conversion, constructive trust, accounting, restitution based on unjust enrichment—appears to stem from the alleged repudiation of the bailment agreements. Moreover, as we shall explain below, in responding to Hungary's arguments that their claims are barred by the FSIA's "treaty exception," the statute of limitations, the political question doctrine, and the act of state doctrine, the family repeatedly emphasizes that their claims are firmly rooted in bailment. Given that plaintiffs are "masters of the complaint" with the power to bring those claims they see fit, *see Caterpillar, Inc. v. Williams*, 482 U.S. 386, 395 (1987), it is incumbent upon us to address Hungary's jurisdictional challenge in light of the

bailment claims the family actually brings. Viewed this way, and without ruling on the availability of the expropriation exception, we believe the family's claims fall comfortably within the FSIA's commercial activity exception. *See Carney v. American University*, 151 F.3d 1090, 1096 (D.C. Cir. 1998) (explaining that "we can affirm a district court judgment on any basis supported by the record").

The Herzog family invokes the provision of the commercial activity exception that abrogates sovereign immunity in any case where "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). To satisfy this exception, "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States." *Rong v. Liaoning Province Government*, 452 F.3d 883, 888–89 (D.C. Cir. 2006). Because Hungary's actions obviously occurred outside the United States, the exception's applicability turns on (1) whether Hungary's repudiation of bailment agreements with respect to the Collection constitutes an act taken in connection with a commercial activity and (2) whether this act caused a "direct effect" in the United States.

Under the first inquiry, we assess "[t]he commercial character of an activity . . . by reference to the nature of the . . . particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). We must examine "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives" but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type*

of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted). Hungary's alleged breach of bailment agreements easily satisfies this standard. A bailment is a form of contract, and a foreign state's repudiation of a contract is precisely the type of activity in which a "private player within the market" engages. *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (internal quotation marks omitted); *see also Janini v. Kuwait University*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) ("Private parties often repudiate contracts in everyday commerce and may be held liable therefor."). Moreover, the alleged contract addresses and establishes commercial relations with respect to artwork, for "[t]here is nothing 'sovereign' about the act of lending art pieces . . . . Loans between and among museums (both public and private) occur around the world regularly." *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (interpreting the term "commercial activity" in section 1605(a)(3) of the FSIA).

Hungary contends that its alleged repudiation of these bailment agreements constitutes a sovereign act not subject to the commercial activity exception. *See Janini*, 43 F.3d at 1536 (explaining that the commercial activity exception "cannot confer jurisdiction over a foreign state 'where a claim rests entirely upon activities sovereign in character, . . . regardless of any connection the sovereign acts may have with commercial activity' " (alteration in original) (quoting *Nelson*, 507 U.S. at 358 n.4)). As Hungary sees it, the bailment obligations alleged by the family arise from a World War II Peace Treaty with the Allied Powers that requires Hungary to restore or provide compensation for certain property expropriated during the Holocaust. *See* Treaty of Peace with Hungary art. 27, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 ("the Peace Treaty"). As a result, Hungary contends, any

breach of these bailment obligations would amount to sovereign conduct, for "failure to adequately address war reparations as required by a treaty does not constitute a commercial activity." Appellants' Br. 42.

Contrary to Hungary's argument, however, the complaint does not rely on the Peace Treaty as the sole source of the bailment obligations. Instead, the complaint contains allegations that the parties directly agreed to a bailment relationship, with Hungary "arrang[ing] with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection" and the Herzog family "agree[ing] to allow the artworks to be 'returned' to the Museums or the University for safekeeping." Compl. ¶¶ 36, 72. Although the complaint refers to the Peace Treaty, it nowhere alleges that the Treaty is the source of the bailment obligations. Instead, it clarifies that Hungary obtained only a custodial interest in looted property, rather than ultimate ownership rights. *See id.* ¶ 31 ("Pursuant to the 1947 Treaty of Peace between Hungary and the Allies . . . , Hungary received only a custodial interest in art that had been looted during the war and subsequently returned to Hungary by the Allies, including the Herzog Collection."); *id.* ¶ 69 ("The 1947 Peace Treaty . . . confirmed that Hungary was to act solely as a custodian or trustee of looted or heirless property [and] under no circumstances could Hungary itself possess any right, title or interest in that property."). Accordingly, as the district court explained, although "plaintiffs' bailment claim is *consistent* with Hungary's representations in the 1947 Peace Treaty, plaintiffs do not assert that the bailment was created by virtue of the Peace Treaty." *de Csepel*, 808 F. Supp. 2d at 136 (citation omitted). It is true, as Hungary emphasizes, that certain statements in the family's district court briefs seem to suggest that the bailment arose from the Peace Treaty. But as the district court noted, the family subsequently "clarified that

they do not rely upon or challenge the terms, conditions, or validity of the Peace Treaty, or seek to claim directly under the Peace Treaty," *id.* at 136 n.6 (internal quotation marks omitted), and nothing in the complaint contradicts this assertion. Accordingly, the Peace Treaty provides no basis for converting the commercial act of contract repudiation into the sovereign act of "treaty participation," as Hungary urges. Appellants' Br. 42.

Nor does the fact that the Herzog Collection was initially expropriated by the Hungarian government compel a contrary conclusion. To be sure, expropriation "constitute[s] a quintessentially sovereign act" falling outside the scope of the commercial activity exception. *Rong*, 452 F.3d at 890. Here, however, the particular conduct upon which the family's suit is "based" for purposes of the commercial activity exception is not the initial expropriation of the Collection during the Holocaust but instead Hungary's creation and repudiation of subsequently formed bailment agreements. *See* Appellees' Br. 49 ("Here, the relevant 'act' or 'acts' for purposes of Section 1605(a)(2) . . . is the creation of a bailment with respect to each of the artworks described in the Complaint."). Taking issue with the family's characterization of their claims, Hungary insists that "[a]lthough Plaintiffs attempt to dress their claim as a bailment, it is simply a claim that Hungary took property from Hungarian citizens near the end of World War II and . . . refused to restitute specific items." Appellants' Reply Br. 35. This is inaccurate. The complaint actually alleges that, by entering into bailment agreements to retain possession of the expropriated artwork and later breaching those agreements by refusing to return the artwork, Hungary took affirmative acts beyond the initial expropriation to deprive the family of their property rights in the Collection. These allegations distinguish this case from one "in essence based on disputed takings of property" and thus outside the

purview of the commercial activity exception. *Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006); *see Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 944–45 (D.C. Cir. 2008) (endorsing theory of a separate deprivation of property rights apart from initial expropriation where court decree required return of the property and foreign state allegedly frustrated enforcement of the decree).

Turning to the second inquiry—whether the act in question caused a "direct effect" in the United States—we ask whether the complaint alleges that Hungary promised to perform specific obligations in the United States. *See Weltover*, 504 U.S. at 619 ("Because New York was . . . the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."); *cf. Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90 (D.C. Cir. 2005) (finding the requisite "direct effect" lacking where plaintiff failed to allege "that Saudi Arabia was supposed to refund his GOSI contribution to him in the United States" (internal quotation marks omitted)). Applying this standard, the Sixth Circuit found that Nazi Germany's seizure of a German resident's artwork caused no "direct effect" in the United States where plaintiffs had "not alleged that Germany ever promised to deliver [the] art collection to the United States." *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 415 (6th Cir. 2011). Here, by contrast, the family alleges that Hungary promised to return the artwork to members of the Herzog family it knew to be residing in the United States and then breached that obligation by refusing to do so. *See* Compl. ¶¶ 36, 101 (alleging that Hungary "knew at all relevant times that the Herzog Heirs owned the Herzog Collection and that

certain of the Herzog Heirs resided in the United States"; "owed the Herzog Heirs a duty of care to protect the property and to return it to them" under the bailment contract; and breached that obligation by "fail[ing] to restitute the Herzog Collection following demand by the U.S. Herzog Heirs"). Although the complaint never expressly alleges that the return of the artwork was to occur in the United States, we think this is fairly inferred from the complaint's allegations that the bailment contract required specific performance—i.e., return of the property itself—and that this return was to be directed to members of the Herzog family Hungary knew to be residing in the United States. *See id.* Indeed, Hungary does not argue that the bailment contract envisioned performance outside the United States, nor did it seek jurisdictional discovery in the district court with respect to the contract's place of performance. Accordingly, drawing all reasonable inferences from the complaint in the family's favor, as we must at this stage of the proceedings, *see Council for Urological Interests v. Sebelius*, 668 F.3d 704, 713 (D.C. Cir. 2011), we find that the family has alleged facts that, if true, would satisfy the commercial activity exception's requirement of a "direct effect" in the United States.

## B.

We next turn to Hungary's contention that the FSIA's "treaty exception" deprived the district court of subject matter jurisdiction. Because FSIA immunity is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of [the FSIA]," 28 U.S.C. § 1604, "[i]f there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails," *Moore v. United Kingdom*, 384 F.3d 1079, 1085 (9th Cir. 2004). "This existing-treaty exception applies, however, only if there is an express conflict between the treaty and the FSIA exception."

*Wyatt v. Syrian Arab Republic*, 266 F. App'x 1, 2 (D.C. Cir. 2008).

According to Hungary, two international agreements create such an "express conflict": the above-mentioned Peace Treaty between Hungary and the Allied Powers; and the Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, U.S.-Hungary, Mar. 6, 1973, 24 U.S.T. 522 ("the 1973 Agreement").

We begin with the Peace Treaty. Hungary contends that the Treaty conflicts with its amenability to suit under the FSIA because the Treaty precludes litigation against it for claims, like the Herzog family's, that seek restitution of property expropriated during World War II. In support, Hungary cites two provisions of the Treaty. Article 27, as noted above, requires Hungary to restore or provide compensation "in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons." Peace Treaty, art. 27. Article 40, in turn, provides that "any dispute concerning the interpretation or execution of the Treaty" that "is not settled by direct diplomatic negotiations" is to be "referred to the Three Heads of [Diplomatic Missions from the Soviet Union, the United Kingdom, and the United States]." *Id.* art. 40. Taken together, Hungary contends, these provisions establish an exclusive treaty-based mechanism for resolving all claims seeking restitution of property discriminatorily expropriated during World War II from individuals subject to Hungarian jurisdiction.

Hungary's argument falters for the simple reason that the Herzog family's claims fall outside the Treaty's scope. Article 27 concerns property discriminatorily expropriated during World War II. As we have explained, however, the family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end. *See supra* at 10–11. Accordingly, the Peace Treaty presents no conflict with Hungary's amenability to suit under the FSIA.

Hungary makes a similar challenge with respect to the 1973 Agreement, contending that the Agreement bars litigation against it for claims based on expropriation of property during World War II. The 1973 Agreement, on which the Hungarian Metropolitan Appellate Court relied in dismissing the Nierenberg litigation, effectuated a "full and final settlement and . . . discharge" of certain specified claims against Hungary by "nationals and the Government of the United States," including, as relevant here, claims for "property, rights and interests affected by Hungarian measures of nationalization, compulsory liquidation, expropriation, or other taking on or before the date of this Agreement" and claims for "obligations of the Hungarian People's Republic under Articles 26 and 27 of the [Peace Treaty]." 1973 Agreement, arts. 1–2. According to Hungary, "[b]ecause (1) Plaintiffs' predecessor (Erzsébet Weiss de Csepel) was a U.S. national at the time the Agreement went into effect, (2) Plaintiffs' claims related to Hungarian property lost as a result of World War II, and (3) Plaintiffs' claims are subject to Article 27 of the Peace Treaty, the 1973 Agreement . . . bars Plaintiffs' claims." Appellants' Br. 36 (internal quotation marks omitted).

The district court rejected this argument, finding that the 1973 Agreement settled only claims of "persons who were

United States citizens at the time of their injury" and thus could not have barred the claims of Erszébet Weiss de Csepel, who was instead a Hungarian citizen at the time of the alleged expropriation. *de Csepel*, 808 F. Supp. 2d at 133–34. Vigorously disputing this interpretation, Hungary argues that the 1973 Agreement applies to all individuals who were U.S. nationals at the time the Agreement was executed, regardless of their nationality when injured.

We need not settle the question of *whom* the Agreement covers because we can easily resolve the issue by examining *what claims* the Agreement covers. To repeat, the Herzog family seeks to recover for breaches of bailment agreements formed and repudiated after World War II, not for the initial expropriation of their property during the war. But because the 1973 Agreement settles claims for property expropriated by Hungary prior to the date of the Agreement, it has no application to bailment agreements allegedly repudiated in 2008. Thus, nothing in the Agreement conflicts with Hungary's amenability to suit under the FSIA.

## C.

Next, Hungary argues that the Herzog family's claims are time-barred. As both parties recognize, the relevant statute of limitations is the District of Columbia's three-year limitations period for claims relating to "the recovery of personal property or damages for its unlawful retention." D.C. Code § 12-301(2); *see Gilson v. Republic of Ireland*, 682 F.2d 1022, 1024 n.7 (D.C. Cir. 1982) ("The applicable statute of limitations [in an FSIA case] is determined by the local law of the forum."). A bailment claim accrues "when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment." *Malewicz v. City of Amsterdam*,

517 F. Supp. 2d 322, 335 (D.D.C. 2007) (citing *In re McCagg*, 450 A.2d 414, 416 (D.C. 1982)). In order to trigger the statute of limitations, a defendant's refusal to return the property "must be absolute and unconditional." *Id.* (internal quotation marks omitted). Given this, the family's claims are barred if Hungary "absolute[ly] and unconditional[ly]" refused to return the property prior to July 27, 2007—three years before they filed their complaint.

Hungary argues that the Herzog family's bailment claims accrued in 1999 when Martha Nierenberg filed suit in Hungary. According to Hungary, that litigation was prompted by its "refus[al] to negotiate with Ms. Nierenberg" and thus marked a clear repudiation of the bailment agreements. Appellants' Br. 63 n.18. Though not addressing the question of accrual, the district court equitably tolled the family's claims during the pendency of the Nierenberg litigation in order to account for their efforts to exhaust remedies in the Hungarian courts. *de Csepel*, 808 F. Supp. 2d at 141–42. Hungary challenges this decision, arguing that because equitable tolling is appropriate only where plaintiffs are unaware of the basis for their claims, tolling should not apply here given that the Herzog family demonstrated knowledge of their claims by suing in Hungary. Moreover, Hungary asserts, equitable tolling designed to account for exhaustion of remedies should have no application to the claims of Angela and Julia Herzog "as there can be no assertion that they were prosecuting their rights (and exhausting their remedies) when they were brought into the Hungarian lawsuit." Appellants' Reply Br. 39 n.14.

We have no need to wade into these equitable-tolling waters because nothing in the complaint indicates that the family's claims did in fact accrue in 1999 when Martha Nierenberg filed suit in the Hungarian court. As our case law

makes clear, "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). The complaint nowhere alleges that Martha Nierenberg sued because Hungary refused to engage in further negotiations. *Cf.* Compl. ¶ 79 (alleging only that "Martha Nierenberg . . . continued her mother's efforts to recover portions of the Herzog Collection, ultimately pursuing legal proceedings in Hungary"). Indeed, although litigation is often filed in response to refusal of a demand, it can also serve as a vehicle for increasing pressure to settle during ongoing negotiations. *See* David C. Croson & Robert H. Mnookin, *Scaling the Stonewall: Retaining Lawyers to Bolster Credibility*, 1 Harv. Negot. L. Rev. 65, 65 (1996) (explaining that a "plaintiff might hope to extract a settlement by threatening suit in pre-trial negotiations"); Juliet Macur, *Government Joins Suit Against Armstrong*, N.Y. Times, Feb. 22, 2013, at D1 (quoting an attorney who explained that the government may "have brought the case [against Armstrong] to try to increase their leverage in working out a deal").

For statute of limitations purposes, the critical point is that the complaint alleges that Hungary's refusal of the family's demand for the Collection did not occur until January 2008, when "Hungary issued its final decision that it would not honor its obligation to return the Herzog Collection to the Herzog Heirs." Compl. ¶ 94. It was only then, the complaint alleges, that Hungary "made clear that any further demand by the Herzog Heirs for restitution of any portion of the Herzog Collection would be futile." *Id.* At summary judgment, Hungary may well be able to show that the family's bailment claims accrued either when the Nierenberg litigation was filed or at some other point prior to 2008. But at the motion to dismiss stage, we look only at the complaint, in

which we see nothing that conflicts with the family's allegation that their bailment claims accrued in January 2008. Because the family filed their complaint within three years of that date, we reject Hungary's statute of limitations argument.

**D.**

We can easily dispose of Hungary's remaining arguments.

Hungary contends that the Herzog family's claims are barred by the political question doctrine. As the district court explained, this argument is "based entirely on the notion that plaintiffs' claims are addressed and settled by the 1947 Peace Treaty and the 1973 Agreement between Hungary and the United States," but the Herzog family instead "charge[s] that Hungary has breached certain agreements regarding specific artwork in a manner that does not implicate existing international compensatory frameworks at all." *de Csepel*, 808 F. Supp. 2d at 143–44. Given this, the family's claims raise no "separation-of-powers concerns that would justify invocation of the political question doctrine." *Id.* at 144.

We are equally unpersuaded by Hungary's reliance on the act of state doctrine. This doctrine, which "requires American courts to presume the validity of an official act of a foreign sovereign performed within its own territory," *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (internal quotation marks omitted), applies only to "conduct that is by nature distinctly sovereign, *i.e.*, conduct that cannot be undertaken by a private individual or entity," *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012). Given that the family seeks to recover for breaches of bailment agreements, the district court got it just right: their claims challenge "not sovereign acts, but rather *commercial* acts" entitled to no "deference under the act of state doctrine."

*de Csepel*, 808 F. Supp. 2d at 143 (internal quotation marks omitted).

Hungary next argues that the complaint fails to state a claim for bailment because it nowhere alleges the necessary element of "mutual consent of the parties." Appellants' Br. 59 (internal quotation marks omitted). Reiterating its contention that the family's bailment claims rest solely on the Peace Treaty, Hungary insists that "an international treaty to end a world war" cannot demonstrate intent to form a bailment agreement. Appellants' Reply Br. 37. But as we have explained, *supra* at 13, the complaint contains allegations that the parties directly agreed to a bailment relationship, with Hungary "arrang[ing] with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection" and the Herzog family "agree[ing] to allow the artworks to be 'returned' to the Museums or the University for safekeeping." Compl. ¶¶ 36, 72.

According to Hungary, however, any showing of consent is negated by the complaint's allegations that the Herzog family "had no choice but to agree to allow most of the works belonging to the Herzog Collection to remain in the physical possession of the Museums and the University" because they were "harassed and threatened" by Hungarian government officials. *Id.* ¶¶ 72–73. We disagree. Even if the family's consent was induced by duress—a conclusion we would be reluctant to draw at the motion to dismiss stage—that would mean only that the family could disclaim the agreement, not that the agreement was invalid. *See* Restatement (Second) of Contracts § 175(1) (1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."); *see also U.S. ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1378

(D.C. Cir. 2000) (explaining that voidable contracts only become invalid if injured party exercises right to disclaim). Thus, for purposes of a motion to dismiss, the family has adequately pleaded the element of consent.

Finally, Hungary argues that the doctrine of forum non conveniens requires dismissal of the family's claims. The forum non conveniens analysis calls for the court to consider "(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Chabad*, 528 F.3d at 950. Here, the district court assumed that Hungary was an adequate alternative forum but found that it "failed to show that the balance of private and public factors favors dismissal in this case." *de Csepel*, 808 F. Supp. 2d at 138. We review the district court's balancing of these factors for "clear abuse of discretion." *Chabad*, 528 F.3d at 950 (internal quotation marks omitted).

In determining that the private interest factors did not favor dismissal, the district court acknowledged Hungary's contention that the events at issue took place in Hungary but reasoned that "many relevant witnesses—namely, plaintiffs themselves as well as Martha Nierenberg—all live outside Hungary." *de Csepel*, 808 F. Supp. 2d at 139. As a result, the district court concluded that "[l]anguage concerns . . . do not shift the balance in favor of Hungary, as relevant depositions and documents would require translation regardless of where this matter is heard." *Id.* With respect to the public interest factors, although Hungary claimed "an interest in having local controversies decided at home" and a superior ability "to interpret and apply both current and historical Hungarian laws," the district court relied, among other public interest factors, on the FSIA's designation of the United States District Court for the District of Columbia as a forum for

actions brought under the statute to conclude that dismissal was unwarranted. *Id.*

On appeal, Hungary argues that witnesses and documentary evidence are likely to be located in Hungary and that translations would be needed if trial is held here. Hungary also argues that it has a strong interest in the subject matter of the litigation and a greater familiarity with the applicable laws. But as explained above, the district court considered all of these arguments, and although Hungary obviously disagrees with the district court's analysis, it has failed to show any "clear abuse of discretion." *Chabad*, 528 F.3d at 950 (internal quotation marks omitted).

## III.

This brings us to the family's cross-appeal. Recall that Martha Nierenberg filed a lawsuit in Hungary seeking return of certain pieces of the Herzog Collection and that the Hungarian Metropolitan Appellate Court dismissed the case. The district court granted comity to the Hungarian judgment and dismissed the family's claims to the eleven pieces of artwork at issue in that litigation. This court has never expressly addressed the standard by which we review a district court's decision to grant comity to a foreign judgment, and other courts of appeals have divided as between de novo and abuse of discretion review. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1009–10 (9th Cir. 2009) (noting divergence among courts of appeals with respect to the proper standard of review). We need not resolve this question, however, because we would reverse under either standard.

The term " '[c]omity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd. v.*

*Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). In determining whether to grant comity to a foreign judgment, we look to the Supreme Court's decision in *Hilton v. Guyot*, 159 U.S. 113 (1895). There, the Court explained that "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh" based "upon the mere assertion of the party that the judgment was erroneous in law or in fact," provided

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect . . . .

*Id.* at 202–03. In addition to the due process concerns identified by *Hilton*, the case law recognizes a narrow "public policy" exception to the doctrine of comity where the foreign judgment is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (internal quotation marks omitted).

The district court found no basis for declining to grant comity to the Hungarian judgment, explaining that " '[t]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in

domestic courts.' " *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Laker Airways*, 731 F.2d at 937). It found unpersuasive the Herzog family's claim that the Hungarian court violated United States public policy by misinterpreting the 1973 Agreement, viewing this argument as nothing more than a request to reexamine the merits of the Hungarian judgment. *Id.* The district court also believed that the family had failed to assert that it lacked "an 'opportunity for a full and fair trial' in Hungary 'before a court of competent jurisdiction, conducting the trial upon regular proceedings.' " *Id.* (quoting *Hilton*, 159 U.S. at 202). Accordingly, the court dismissed the family's claims to the eleven pieces of artwork at issue in the Hungarian proceedings.

On appeal, the family renews their contention that the Hungarian judgment violated the United States' "strong public interest in ensuring that its executive agreements . . . are interpreted correctly" by adopting an "indefensible" construction of the 1973 Agreement under which Martha Nierenberg's claims were deemed barred. Appellees' Br. 74–75. As the district court explained, however, this claim "is precisely the type of 'mere assertion' by a party that a foreign judgment 'was erroneous in law or in fact' that the Supreme Court has held *may not* be grounds for declining to respect the results of foreign judgments." *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Hilton*, 159 U.S. at 203); *see also Medellin v. Dretke*, 544 U.S. 660, 670 (2005) ("It is the long-recognized general rule that, when a judgment binds or is respected as a matter of comity, a 'let's see if we agree' approach is out of order.").

The family also claims that comity is inappropriate because the Hungarian judgment was rendered "as a result of proceedings that were not conducted in accordance with internationally recognized standards of due process or in

accordance with international law." Compl. ¶ 79. Granting comity would certainly be inappropriate if the Hungarian proceedings in fact failed to satisfy *Hilton*'s requirements of an "opportunity for a full and fair trial" under "a system of jurisprudence likely to secure an impartial administration of justice." *Hilton*, 159 U.S. at 202; *see also Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410 (9th Cir. 1995) ("It has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process."); Restatement (Third) of the Foreign Relations Law of the United States § 482(1) (1987) ("A court in the United States may not recognize a judgment of the court of a foreign state if . . . the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law . . . ."). The family contends that they "should have been given the opportunity to develop [the] factual record" regarding these alleged due process violations "further past the Rule 12 stage." Appellees' Br. 76. We agree. The complaint's allegations of due process violations present just the kind of fact-intensive issues inappropriate for resolution on a Rule 12(b)(6) motion.

Hungary argues that the family's complaint fails to specify any "cognizable allegations of wrongdoing" and is thus "devoid of any allegations sufficient to demonstrate (or even suggest) that [Martha Nierenberg] was not afforded due process." Appellants' Reply Br. 55. But "comity is an affirmative defense" for which the party seeking recognition of the judgment bears the burden of proof, *see Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007) (internal quotation marks and alteration omitted), and although it is certainly true that plaintiffs must plead the elements of their *claims* with specificity, they are "not required to negate an affirmative defense in [their] complaint," *Flying Food Group, Inc. v.*

*NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Kim v. United States*, 632 F.3d 713, 718–19 (D.C. Cir. 2011) (concluding that a plaintiff need not plead exhaustion of statutory remedies under the Taxpayer Bill of Rights because failure to exhaust is an affirmative defense); *Davis v. Indiana State Police*, 541 F.3d 760, 763–64 (7th Cir. 2008) (explaining that the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), did not alter the principle that "[c]omplaints need not anticipate, and attempt to plead around, potential affirmative defenses"). Instead, as long as a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint," dismissal at the Rule 12(b)(6) stage is improper. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc)*; see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) (explaining that an affirmative defense may only "be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint"). Because nothing in the complaint contradicts the family's claims of due process violations, dismissal at this stage was inappropriate. Of course, we express no opinion as to whether the due process violations alleged by the family actually occurred or, if so, whether they amounted to such "outrageous departures from our notions of civilized jurisprudence" as to require non-recognition of the Hungarian judgment. *Bird v. Glacier Electric Cooperative, Inc.*, 255 F.3d 1136, 1142 (9th Cir. 2001) (internal quotation marks omitted). These issues are properly addressed at summary judgment or trial.

## IV.

For the foregoing reasons, we affirm in part and reverse in part.

*So ordered*.