[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16816

_____

D.C. Docket No. 1:12-cv-23743-PCH

RICARDO DEVENGOECHEA,

Plaintiff - Appellee,

versus

BOLIVARIAN REPUBLIC OF VENEZUELA,
a foreign state,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 10, 2018)

Before WILLIAM PRYOR, MARTIN, and ROSENBAUM, Circuit Judges.

ROSENBAUM, Circuit Judge:

Almost two-hundred years ago, on the island of Santa Marta in the Caribbean, General Simón Bolívar spent his last days at the home of his friend Joaquín de Mier.[1]  Through his relationship with Bolívar, de Mier obtained a treasure trove of Bolívar's possessions (the "Bolívar Collection").

Because some readers might not be as familiar with Bolívar as with, say President George Washington, we pause for a moment to briefly note Bolívar's enormous historic significance.[2]  Bolívar, who was born in 1783, was a contemporary of George Washington and was a founding father in South America not long after Washington played that role in North America.[3]  In fact, Bolívar was instrumental in helping six countries obtain independence from their former ruling sovereign (Spain) and become sovereign nations in their own right:  Venezuela, Bolivia, Colombia, Ecuador, Peru, and Panama.[4]

---

[1] Marie Arana, *Bolívar:  American Liberator* 450–54 (2013).  Bolívar died of tuberculosis.  *Id.* at 451.

[2] Our task at hand prevents us from doing more than oversimplifying Bolívar's role in history.  Like most historic figures, Bolívar was a complex man who lived a complicated life.  We do not suggest a value judgment about whether Bolívar's role in history was either a positive or negative force.  Rather, we invoke the comparison to Washington only to indicate that, like Washington, Bolívar was extremely important in world history.

[3] Indeed, Washington's family sent Bolívar a letter describing him as "the Washington of the South."  *Id.* at 447, 562 (quoting Letter from George Washington Custis to Bolívar (Aug. 26, 1825) (reprinted in *The United States of Venezuela in 1893*, 144 (Gov't of Venez., 1893) (published for the World's Columbian Exposition at Chicago)).  And it is said that in Washington, D.C., in 1825, at a dinner in honor of Gilbert du Motier, Marquis de Lafayette, attended by President James Monroe, John Quincy Adams, and Andrew Jackson, Henry Clay toasted "to General Simón Bolívar, the George Washington of South America!"  *Id.* at 337, 531 (citing Robert V. Remini, *Henry Clay:  Statesman for the Union* 257 (W.W. Norton & Co. 1991)).

[4] *See generally* Arana, *supra* note 1.

As you might expect, the personal effects and professional mementos that Bolívar acquired over his life have taken on a remarkable significance.  And that is where history intersects with our story.

It turns out that de Mier's great, great grandson is Plaintiff-Appellant Ricardo Devengoechea.  In the years after de Mier's death, Devengoechea's ancestors passed down the Bolívar Collection from generation to generation until, eventually, Devengoechea inherited it.  Among the items he received are thousands of Bolívar's historic documents, including governmental documents and Bolívar's correspondence and other writings; Napoleon Bonaparte's ornamental epaulets; Bolívar's one-of-a-kind Liberation Medal of Peru; and a lock of Bolívar's hair.  According to Devengoechea, today the Collection is worth millions of dollars because of its association with Bolívar.  This case concerns the journey the Bolívar Collection took after Devengoechea inherited it.

When our story began in 2007, Devengoechea had the Bolívar Collection in the United States.  That's when Defendant-Appellant Bolivarian Republic of Venezuela ("Venezuela")[5] entered the picture.  Perhaps not surprisingly, when

_____

[5] Venezuela became known as the Bolivarian Republic of Venezuela in 1999, when the Constituent Assembly held a constitutional convention in which it drafted a new constitution for the country.  Library of Congress, Fed. Research Div., *Country Profile: Venezuela, March 2005*, 1, 3–4 (2005), https://www.loc.gov/rr/frd/cs/profiles/Venezuela.pdf.  At that time, the country, formerly known as the Republic of Venezuela, was renamed the Bolivarian Republic of Venezuela.  *Id.* at 1, 22.  Although the term "Bolivarianism" once encompassed the political ideas of Bolívar, commentators describe its current meaning as including different notions. Joshua Keating, *War of Ideas:  Was Bolivar a 'Bolivarian'?*, Foreign Policy (Mar. 6, 2013),

Venezuela learned of the Bolívar Collection, Devengoechea asserts, it expressed interest in purchasing it.

Towards this end, Venezuela sent officials to the United States to meet with Devengoechea and negotiate. Devengoechea contends that while the Venezuelan officials were in the United States, he and they reached an understanding and agreement that Devengoechea would take the Bolívar Collection to Venezuela for further inspection, and Venezuela would either purchase it or return it to Devengoechea. Based on this agreement, on October 17, 2007, Devengoechea and the Venezuelan delegation flew to Venezuela on the Venezuelan delegation's private jet. Devengoechea took along the Bolívar Collection.

Five years later, Venezuela still had neither returned nor paid for the Bolívar Collection, despite Devengoechea's repeated inquiries about obtaining payment or return.

So Devengoechea filed this action against Venezuela, seeking payment for or return of the Bolívar Collection. He asserted jurisdiction under the commercial-

---

http://foreignpolicy.com/2013/03/06/was-bolivar-a-bolivarian/ (last visited May 9, 2018). In particular, "Venezuelan president Hugo Chávez, the modern exponent of Bolivarianism, trace[d] the ideology to the thought of Karl Marx, Antonio Gramsci, Leon Trotsky, and Mao Zedong, to the Italian philosopher Antonio Negri, and even Jesus Christ." *Id.* (quoting Dario Azzellini, *Bolivarianism, Venezuela*, *in 2 International Encyclopedia of Revolution and Protest, 1500 to Present* 413 (Immanuel Ness ed., 2009)). Nevertheless, commentators suggest that modern Bolivarianism does take two specific ideas from Bolívar: "his vision of pan-American—or at least pan-Hispanic American unity—and his support for a strong central state." *Id.*

4

activity exception to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1605(a)(2) ("FSIA" or the "Act").

Venezuela moved to dismiss, claiming sovereign immunity.  The district court denied Venezuela's motion, and Venezuela appealed.  We now affirm.

## I.[6]

Devengoechea is a United States citizen living in Orlando, Florida.  In 2007, he received a phone call from Jorge Mier Hoffman, a relative of his, on behalf of Venezuelan officials, requesting copies of select items in the Bolívar Collection. Soon afterward, Venezuelan officials contacted Devengoechea directly to arrange a meeting with him in Orlando so they could inspect the Collection in person.

The first meeting occurred on October 14, 2007, after Venezuelan officials flew by private jet to the United States.  Among the Venezuelan delegation was Delcy Rodríguez, then the Coordinator General of the Office of the Vice President of Venezuela.[7]  During the three-hour meeting in Orlando, the Venezuelan officials began negotiations for a potential purchase of it.

---

[6] On a motion to dismiss, we take the factual allegations in the complaint as true, even if they are subject to dispute. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993).  We also construe the factual allegations in the light most favorable to the plaintiff. *Hond. Aircraft Registry, Ltd. v. Gov't of Hond.*, 129 F.3d 543, 545 (11th Cir. 1997).

[7] Currently, Rodríguez serves as the President of the Constituent Assembly of Venezuela. *Delcy Rodriguez: Venezuela's Most Powerful Person?*, BBC News (Aug. 8, 2017), http://www.bbc.com/news/av/world-latin-america-40868427/delcy-rodriguez-venezuela-s-most-powerful-person (last visited May 9, 2018).

5

The next day, at the Venezuelan delegation's request, Devengoechea took the Bolívar Collection to the Orlando hotel where the Venezuelan officials were staying. There, the officials examined the Collection, and the parties engaged in another meeting and set of negotiations for Venezuela's purchase of the Bolívar Collection—this time for five hours. During the meeting, the Venezuelan delegation also asked Devengochea to take the Collection and travel with them to Venezuela, where Venezuela's experts could further inspect the Collection and where negotiations for purchase were to continue.

Though Devengoechea was not opposed to the request, he had a problem: his passport had expired. When the Venezuelan officials learned of the situation, they asked Devengoechea to go to the Passport Office in Miami the next day to obtain a new passport on an expedited basis, so Devengoechea could accompany them to Venezuela with the Bolívar Collection. Then the Venezuelan officials arranged for Zueiva Vivas, President of Venezuela's Foundation of National Museums, to email Devengoechea a letter on the letterhead of "Fundacion Museos Nacionales" in the "Ministerio del Poder Popular" of the "Gobierno Bolivariano de Venezuela," which translates to the Foundation of National Museums in the Ministry of Popular Power of the Government of the Bolivarian Republic of Venezuela ("Venezuelan Ministry of Culture"). The officials explained that the

6

letter would allow Devengoechea to receive his passport the following day, so he could travel with the Venezuelan delegation back to Venezuela.

As Venezuela requested, Devengoechea made an appointment to obtain his passport on an emergency basis on October 16, 2007. That day, Devengoechea drove to Miami, with the letter, for a 9 a.m. appointment at the passport office. After receiving his passport that afternoon, Devengoechea drove back the more than 200 miles to Orlando, packed up the Collection, and met the Venezuelan officials at the airport. On October 17, 2007, after continuing negotiations for about an hour, they boarded the private jet and set course for Caracas, Venezuela. Devengoechea alleges that he never would have done these things, had he and the Venezuelan officials not reached the understanding and agreement that Venezuela would, after further examination of the Collection, either return it to him or pay him for it.

While en route to and following their arrival in Venezuela, the parties continued to negotiate about the potential sale of the Collection. During these discussions, Devengoechea mentioned that he might have more memorabilia back in Orlando. Venezuelan officials, including Rodríguez, then paid for Devengoechea to fly back to Orlando to gather additional items concerning Bolívar. Once Devengoechea had done so, Venezuelan officials paid for Devengoechea to return to Venezuela with the additional items.

Devengoechea remained in Venezuela until about November 6, 2007. At that time, Venezuelan officials informed him that they needed more time to examine the Collection because of its vast size and that they would contact him about purchasing it once they had completed their examination. Devengoechea alleges that he left the Bolívar Collection with Venezuela based on the agreement and understanding that Venezuela either would pay Devengoechea for the Collection or would return it to him.

Over the next two to three years, Devengoechea contacted the Venezuelan officials periodically about the Collection. Each time, he was told they needed more time to inspect it. During this period, Devengoechea took Venezuela at its word, and based on these representations, took no immediate action to obtain assistance in procuring the return of the Collection.

But in July 2010, Venezuelan President Hugo Chávez announced that he would be exhuming Bolívar's body. Devengoechea surmised that one reason for the exhumation was to test the DNA in the Bolívar Collection's lock of hair against Bolívar's DNA. After the exhumation, Devengoechea's calls to Venezuelan officials went unanswered. Despite Devengoechea's demands, Venezuela neither paid for nor returned the Bolívar Collection to Devengoechea. To date, that remains the case.

**II.**

8

In an effort to remedy that situation, Devengoechea filed suit against Venezuela in the Southern District of Florida. Devengoechea asserts five counts in his Second Amended Complaint: declaratory relief (Count I); damages for breach of agreement and unjust enrichment (Counts II and III, respectively) under Clause 1 of the commercial-activity exception of the FSIA; and damages for breach of agreement and unjust enrichment (Counts IV and V, respectively) under Clause 2 of the commercial-activity exception of the FSIA. For all counts, Devengoechea invokes the Court's jurisdiction under all three clauses of the commercial-activity exception of the FSIA, 28 U.S.C. § 1605(a)(2).

Venezuela filed a motion seeking dismissal of the Second Amended Complaint for lack of subject-matter and personal jurisdiction and for failure to state a claim. The district court denied Venezuela's motion, concluding that subject-matter jurisdiction exists under the first clause of the FSIA's commercial-activity exception. To reach this conclusion, the district court found that the Second Amended Complaint sufficiently alleged facts establishing a breach in Florida of a bailment agreement that the parties entered into in Florida. Alternatively, the district court determined that jurisdiction exists under the third clause of the FSIA's commercial-activity exception because Venezuela was required to pay Devengoechea in the United States, and it failed to do so, causing a direct effect in the United States. Because the district court otherwise found

9

jurisdiction, it declined to address the second clause of the FSIA's commercial-activity exception.

## III.

We review *de novo* the district court's determination that it had jurisdiction under the FSIA. *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1289 (11th Cir. 1999). On a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute. *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993). Finally, we can affirm on any basis that the record supports. *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008) (citation omitted).

## IV.

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602, *et seq.*, renders foreign states immune from the jurisdiction of United States Courts unless one of its statutory exceptions applies to the plaintiff's claim. *See* 28 U.S.C. §§ 1604–1605; *see also Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (citation and internal quotation marks omitted) ("The FSIA . . . provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States."). This case requires us to consider two of the FSIA's statutory exceptions: the commercial-activity exception, 28 U.S.C. § 1605(a)(2), and the expropriation exception, 28 U.S.C. § 1605(a)(3).

10

### A.    *The Commercial-activity Exception*

We begin with the commercial-activity exception.  That exception provides for jurisdiction over foreign states when at least one of its three clauses applies:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Devengoechea asserts that jurisdiction exists here under all three clauses, but as it turns out, we need consider only the third clause.

Before we can do so, though, we must first understand the concept of "commercial activity" under the FSIA.  The Act defines "commercial activity," which appears in each of the commercial-activity exceptions three clauses, as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  Under the definition, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id*.  As the Supreme Court has observed, "[t]his definition . . . leaves the critical term 'commercial' largely undefined . . . ."  *Weltover*, 504 U.S. at 612.  So we turn to what the Supreme Court has said about the meaning of that word.

11

The term "commercial" bears the same meaning under the FSIA as it did in the pre-FSIA regime, when the State Department generally made determinations of foreign sovereign immunity.[8] *See id.* at 612–14. The State Department operated under the "restrictive" theory of foreign sovereign immunity, which provided that "the sovereign immunity of foreign states should be 'restricted' to cases involving acts of a foreign state which are sovereign or governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform." H.R. Rep. No. 94-1487, at 14 (1976); *see also Weltover*, 504 U.S. at 612–14; *Guevara v. Republic of Peru*, 468 F.3d 1289, 1295 (11th Cir. 2006) (citation omitted).

The FSIA essentially codified the "restrictive" theory of foreign sovereign immunity. *Weltover*, 504 U.S. at 612; *see also* H.R. Rep. No. 94-1487, at 7. Under the Act's provisions, "[a] foreign state engaging in 'commercial' activities does not exercise powers peculiar to sovereigns; rather, it exercises only those powers that can also be exercised by private citizens." *Weltover*, 504 U.S. at 614 (citation, internal quotation marks, and alterations omitted); *see also Nelson*, 507 U.S. at 359 ("[T]he meaning of 'commercial' for purposes of the Act must be the meaning Congress understood the restrictive theory to require at the time it passed the statute.").

---

[8] For a more detailed summary of pre-FSIA foreign-sovereign-immunity law, *see Guevara v. Republic of Peru*, 468 F.3d 1289, 1295–97 (11th Cir. 2006).

But that is not our sole consideration in determining whether activity qualifies as "commercial."   We must also remember that under the FSIA's definition of "commercial activity," whether a foreign government acts out of a profit motive or out of a desire to fulfill "uniquely sovereign objectives" is entirely irrelevant to the analysis of whether an activity qualifies as "commercial." *Weltover*, 504 U.S. at 614.   Instead, we must determine "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id*. (citations omitted) (emphasis in original).  As the Supreme Court has explained, "whether a state acts 'in the manner of' a private party is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360.   For example, a claim "based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation" states "commercial activity," even if the foreign state engages in this activity to help stabilize its own currency.  *Weltover*, 504 U.S. at 613–14.

Here, Devengoechea's claims rely on "commercial activity" by Venezuela. Venezuela engaged in all challenged actions during the course of negotiations for the purchase of a private collection of artifacts.  It did not seize the items through its police or other sovereign powers.  Rather, like a private buyer could do, Venezuela flew to the United States to meet with the seller, examined the

13

Collection, and negotiated to examine it further and return or purchase it. This is the type of activity that private persons and corporations regularly engage in. Nothing about this activity is uniquely or peculiarly sovereign in nature. Even Venezuela has not characterized itself as having exercised sovereign powers to obtain or retain the Collection.[9] To the contrary, Venezuela conceded before the district court that the negotiations for the potential sale of the Collection constituted "commercial" activity. *See* App. Vol. II at A380.[10] We find no reason to disagree.

1. Devengoechea's claims are "based upon" Venezuela's failure to pay Devengoechea for the Bolívar Collection or to return the Collection to him.

---

[9] The burden of production to make an initial showing that jurisdiction exists because a FSIA exception applies falls on the plaintiff. *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 727 F.3d 10, 17 (1st Cir. 2013) (citing *Nelson*, 507 U.S. at 356); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992). But once the plaintiff has satisfied this burden, the defendant must bear the ultimate burden of persuasion to show that no FSIA exceptions to immunity apply. *Universal Trading*, 727 F.3d at 17 (citation omitted); *see also Cargill Int'l*, 991 F.2d at 1016; *Arriba Ltd.*, 962 F.2d at 533. Nevertheless, to the extent that a plaintiff's invocation of a FSIA exception rests exclusively on a legal argument (as opposed to a factual one), to establish jurisdiction under the FSIA, the plaintiff bears the ultimate burden of proving that the FSIA exception he or she seeks to invoke applies as a matter of law. *See Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017).

[10] Before the district court, the following exchange occurred:

THE COURT: . . . I don't see in your papers where you have actually challenged the determination that the activity is commercial activity as opposed to noncommercial activity solely within the realm of a sovereign.

VENEZUELA: That's correct, Your Honor.

THE COURT: Okay. So that's not an issue. So we're dealing with commercial activity.

VENEZUELA: Exactly, exactly. . . .

With this understanding of "commercial activity," we begin the first step in any commercial-activity-exception analysis.  All three of the commercial-activity exception's clauses apply only when the action is "based upon" the conduct that the exception describes.  *Nelson*, 507 U.S. at 356.  So at the first step in a commercial-activity-exception case, we must identify the conduct upon which the suit is based.  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) (citation omitted).  That, in turn, requires us to look at "the 'particular conduct' that constitutes the 'gravamen' of the suit."  *Id.*  In other words, we focus on the "core" of the suit—the foreign state's "acts that actually injured" the plaintiff.  *Id.*; *see also Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016) (quoting *Black's Law Dictionary* 817 (10th ed. 2014) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint")).

The Supreme Court's decisions in *Nelson* and *Sachs* show how this concept works in practice.

We begin with *Nelson.*  There, the plaintiff, Nelson, was in the United States when he was recruited for a position in a Saudi Arabia Government-controlled hospital.  507 U.S. at 351–52.  Ultimately, Nelson signed a contract in the United States to work at the Saudi hospital.  *Id.* at 352.  While working there, Nelson discovered safety hazards and repeatedly reported them to the hospital, which

15

instructed Nelson to ignore the problems. *Id.* Not long after that, agents of the Saudi Government arrested, tortured, beat, and imprisoned Nelson in difficult conditions for over a month. *Id.* at 352–53.

Nelson sued Saudi Arabia and its hospital, alleging, among other causes of action, various intentional torts, including battery, unlawful detainment, wrongful arrest and imprisonment, false imprisonment, inhuman torture, disruption of normal family life, and infliction of mental anguish. *Id*. at 353–54. To support the "based upon" requirement, Nelson relied on the facts that Saudi Arabia had recruited him to work at the hospital, had signed an employment contract with him, and had ultimately employed him. *Id.* at 358.

The Supreme Court held that no jurisdiction existed under the FSIA because Nelson's claims were not "based upon" these acts. *Id.* Rather, Nelson's tort claims were, of course, based upon Saudi Arabia's tortious conduct. *Id.* But that tortious conduct did not constitute "commercial activity." *Id.* Rather, Saudi Arabia undertook its tortious conduct by exercising the powers of police and penal officers—actions that are peculiarly sovereign in nature and therefore necessarily not "commercial." *Id.* at 361–63.

In *Sachs*, the problem was different than that in *Nelson*: unlike in *Nelson*, at least some of Sachs's claims, on their faces, involved commercial activity. But Sachs's claims did not enjoy jurisdiction under the FSIA because the commercial

16

activity on which Sachs relied for FSIA jurisdiction was not the true basis for her claims, as the Supreme Court construed the phrase "based upon."

In *Sachs*, the Supreme Court applied the meaning of "based upon" in the context of a suit relying on the first clause of the commercial-activity exception, so the plaintiff had to show that her action was "based upon a commercial activity carried on in the United States by the foreign state." 136 S. Ct. at 394 (quoting 28 U.S.C. § 1605(a)(2)). That she could not do.

Sachs, a California resident, bought a ticket in the United States for rail travel in Europe. *Id.* at 393. Unfortunately, she fell onto the tracks at a station in Austria while trying to board a train operated by the Austrian state-owned railroad company. *Id.* As a result, Sachs experienced traumatic injuries. *Id.* She then sued Austria for negligence, strict liability for design defects, strict liability for failure to warn of design defects, breach of an implied warrant of merchantability for providing a train and platform unsafe for their intended uses, and breach of an implied warranty of fitness for providing a train and platform unfit for their intended uses. *Id.* Sachs relied on the sale of the Eurail pass in the United States to establish that her claims were "based upon" commercial activity in the United States because the sale of the pass was an element of each of her claims. *Id.* at 394–95.

17

The Supreme Court disagreed that the FSIA provided for jurisdiction. *Id*. at 395–96. First, the Court concluded that Sachs's claims were not "based upon" the sale of the Eurail pass. *Id.* As the Court explained, there was "nothing wrongful about the sale of the Eurail pass standing alone." *Id.* at 396. And second, the Court found that the conduct making up the gravamen of Sachs's suit happened in Austria because "[a]ll of her claims turn[ed] on the same tragic episode" that occurred there. *Id.* Nevertheless, the Court did caution that "[d]omestic conduct with respect to different types of commercial activity may play a more significant role in other suits . . . ." *Id.* at 397 n.2. And significantly, it expressly recognized that the gravamina of different claims may occur in different locations. *Id.*

Applying these concepts here, we identify the conduct on which Devengoechea bases his suit. The conduct that actually injured Devengoechea—and therefore that makes up the gravamen of Devengoechea's lawsuit—is Venezuela's failure to return the Bolívar Collection to Devengoechea or to pay him for it. And both of Devengoechea's causes of action—breach of contract and unjust enrichment—turn on this circumstance. In the breach-of-contract claim, Venezuela's failure to return the Collection constitutes the alleged breach, and in the unjust-enrichment claim, Venezuela's failure to pay for or return the Collection to Devengoechea has allegedly caused Venezuela's unjust enrichment.

2.    The Third Clause of the FSIA's Commercial-Activity Exception

18

Since we have identified the conduct upon which Devengoechea's claims are based and have determined that Venezuela engaged in commercial activity in this case, we evaluate whether the allegations in this case satisfy the circumstances of the third clause of the commercial-activity exception.

Under the third clause, a plaintiff may establish jurisdiction if his action is based upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  For jurisdiction to exist under this clause, "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States."  *de Csepel v. Republic of Hung.*, 714 F.3d 591, 598 (D.C. Cir. 2013) (citation and internal quotation marks omitted); *see also Weltover*, 504 U.S. at 611.

Here, all three conditions are satisfied.

First, Devengoechea's lawsuit is based on an act that occurred outside the United States—namely, Venezuela's decision not to pay Devengoechea for the Collection or to return the Collection to him.  It was this act that directly caused Venezuela's failure to pay for or return the Bolívar Collection to Devengoechea.  Devengoechea alleged that "after the July 2010 exhumation [of Bolívar,

19

Venezuela] . . . decided to retain the benefit of the [Bolívar] Collection without paying for it, thereby breaching the parties' agreement and understanding and unjustly enriching [Venezuela]." Second Am. Compl. at ¶ 50. Since Venezuela's latest visit to the United States in connection with its attempts to purchase the Bolívar Collection happened in October 2007, Venezuela's decision not to pay for or return the Collection, which Devengoechea asserts occurred sometime in July 2010 or later, must have taken place in Venezuela. As a result, the first condition of the third clause of the commercial-activity exception is satisfied.

Second, Venezuela undertook its decision to neither pay Devengoechea nor return the Collection to him, in connection with a commercial activity— specifically, Venezuela's negotiations in the private market for the Bolívar Collection.

And finally, Venezuela's decision not to pay Devengoechea or to return the Collection to him had a direct effect in the United States. A "direct effect" is one that follows "as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (citation omitted). The effect must be more than "purely trivial" or "remote and attenuated," but it need not be a substantial or foreseeable effect. *Id.* In evaluating a "direct effect," we ask, "[W]as the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Guevara v. Republic of Peru*, 608 F.3d 1297,

20

1309 (11th Cir. 2010) (quoting *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir. 1982) (internal citation and quotation marks omitted)).

*Weltover* demonstrates the meaning of "direct effect."  In that case, Argentina and its bank sold bonds to raise United States dollars to repay their foreign debts when they matured. *Weltover*, 504 U.S. at 609–10.  The plaintiffs, who had bought some of these bonds, designated New York as the place of payment and sued Argentina when it failed to pay after it unilaterally rescheduled the time for payment. *Id.* at 610.  Based on the fact that New York was "the place of performance for Argentina's ultimate contractual obligations," the Supreme Court concluded that Argentina's rescheduling of its obligations to repay the bonds "necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619.

We have construed *Weltover* to stand for the proposition that a "direct effect" occurs in the United States when "monies or goods [are] due in the United States." *Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005). We therefore consider whether the Second Amended Complaint sufficiently alleges that monies or goods were due in the United States.

In a case materially indistinguishable from ours, the District of Columbia Circuit found that goods were due in the United States, so a "direct effect" occurred here. *De Csepel*, 714 F.3d 591, involved the Herzog Collection, "one of Europe's largest and finest private art collections." *Id.* at 594. During the Holocaust, the Hungarian government, acting in conjunction with Nazi Germany, had seized the Collection from the *de Csepel* plaintiffs' ancestors. *Id.* at 594–95. After World War II ended, the plaintiffs alleged, the Hungarian government reached bailment agreements with them concerning the Herzog Collection. *Id.* at 596. Under the alleged agreements, upon demand, the Hungarian government had "a duty . . . to return" the property to the plaintiffs, whom it knew to reside in the United States. *Id.* at 596, 601. When Hungary failed to return the Herzog Collection, the plaintiffs sued for bailment, conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment. *Id.* at 596.

The District of Columbia Circuit concluded that jurisdiction existed under the third clause of the commercial-activity exception. *Id.* at 601. In reaching this determination, the court explained that Hungary's refusal to return the property to the plaintiffs in the United States caused the requisite "direct effect" in the United States. *Id.* While the complaint did not expressly allege that the return of the artwork was to take place in the United States, significantly, the court opined that

22

"this is fairly inferred from the complaint's allegations that the bailment contract required specific performance—i.e., return of the property itself—and that this return was to be directed to [the plaintiffs] Hungary knew to be residing in the United States." *Id.*

We agree with the District of Columbia Circuit's reasoning and see no meaningful legal difference between the allegations in *de Csepel* and those at issue here. Like the *de Csepel* plaintiffs, Devengoechea alleges the existence of a bailment arrangement between himself and a foreign state.

Also as in *de Csepel*, when we read the allegations of Devengoechea's complaint in the light most favorable to Devengoechea, we must conclude that payment for or return of the Collection at issue was necessarily to occur in the United States. The *de Csepel* plaintiffs alleged that the bailment contract required return of the artwork at issue there to the plaintiffs in the United States since the foreign state knew the *de Csepel* plaintiffs lived in the United States; Devengoechea alleged that his agreement with Venezuela required payment for or return of the Bolívar Collection to him, and Venezuela knew he was living in the United States.

Indeed, the complaint avers that Devengoechea is a citizen of Florida and the United States, who maintained the Bolívar Collection at his permanent residence in Florida. Second Am. Compl. at ¶¶ 5, 12, 18. And it asserts extensive allegations

23

setting forth a lengthy description of Venezuela's interactions with Devengoechea in Florida, which establish Venezuela's knowledge of Devengoechea's residence. *See id.* at ¶¶ 5 ("Venezuela initiated commercial dealings with plaintiff through telephonic and written communications *addressed to plaintiff in Florida*") (emphasis added), 21 (Venezuela "contacted plaintiff to arrange to meet plaintiff in Orlando, Florida (where plaintiff lives)"), 22 (Venezuela's officials "flew by private jet from Venezuela to Orlando, Florida, to meet plaintiff to examine the complete [Bolívar] Collection"), 23–25, 26 ("[P]laintiff informed these Venezuelan officials that his [U.S.] Passport had expired, [and] they requested that plaintiff go to the Passport Office in Miami, Florida"), 27–31, 40 ("At the request of Venezuela's officials who were examining the [C]ollection, . . . plaintiff returned to Orlando, Florida, . . . to search for and bring back to Venezuela . . . further artifacts and memorabilia concerning Simon Bolivar"), 41 ("Venezuela, at its own expense and for its own benefit, sent plaintiff back to Florida to search for more materials"), 42 (Devengoechea's "round-trip travel, from Caracas, Venezuela to Orlando, Florida and back, occurred on American Airlines, fully paid by . . . Venezuela"). Because Devengoechea alleges that payment for or return of the Bolívar Collection was to occur "to him," and because he sufficiently asserts that Venezuela knew that he resided in Florida, in the United States, we understand his

24

Second Amended Complaint to allege that Venezuela was required to either make payment or return the Collection to Devengoechea in Florida.

Nor does the fact that Devengoechea alleges payment to him as an alternative for the return of the Collection (when the *de Csepel* plaintiffs did not) affect the analysis. Nothing in the record alleges, or even suggests, that Devengoechea maintains a bank account outside of the United States, so on a motion to dismiss, we reasonably understand the allegations in the light most favorable to Devengoechea to mean that payment was to occur in the United States.

Because the Second Amended Complaint satisfies all three requirements to establish jurisdiction under the third clause of the commercial-activity exception, we affirm the district court's ruling as it pertains to that clause. And since jurisdiction exists under the third clause, we do not consider whether it also may exist under any other clauses.

3. <u>The Second Amended Complaint sufficiently alleges acts attributable to Venezuela</u>

Finally, because jurisdiction lies under the third clause of the FSIA's commercial-activity exception, we must address Venezuela's claim that the Second Amended Complaint fails to adequately allege action by Venezuela. We find no merit to that argument.

25

The commercial-activity exception lifts sovereign immunity based upon activity "by the foreign state" or "of the foreign state." *See* 28 U.S.C. § 1605(a)(2). But whether a plaintiff may breach sovereign immunity under the FSIA when the action is based on the acts of a representative of a foreign state who acts with apparent authority (as opposed to actual authority) is a question that remains the subject of some debate. *Compare First Fid. Bank, N.A. v. Gov't of Ant. & Barb.*, 877 F.2d 189, 194 (2d Cir. 1989) (holding that a purported foreign-state actor's apparent authority may suffice to allow a plaintiff to proceed under the FSIA), *with Dale v. Colagiovanni*, 443 F.3d 425, 428–29 (5th Cir. 2006) (holding that actual authority is required), *Velasco v. Gov't of Indon.*, 370 F.3d 392, 400 (4th Cir. 2004) (same), *and Phaneuf v. Republic of Indon.*, 106 F.3d 302, 308 n.4 (9th Cir. 1997) (same).

And while we have not directly opined on the precise issue, in a FSIA case, we have considered whether a foreign state's ambassador's express waiver of his country's sovereign immunity suffices to, in fact, waive his country's sovereign immunity in the absence of evidence of the ambassador's actual authority to waive sovereign immunity. We determined that, with respect to ambassadors, under the FSIA, "courts should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it

26

'obvious' that he or she does not."[11]  *Aquamar*, 179 F.3d at 1299.  In reaching this conclusion, we expressed concern that "[r]equiring the courts to look to a sovereign's local law to determine the authority of any agent who purports to waive sovereign immunity . . . would hinder the goals of the FSIA and its waiver provision."  *Id.* at 1298.  And we further reasoned that "[s]uch a rule at best would create a roadblock to all FSIA actions, requiring lengthy, unpredictable, and frequently inconclusive inquiries into conflicting interpretations of foreign law . . . .   The foreign state would have the opportunity of raising immunity perhaps even after it has unsuccessfully defended on the merits."  *Id.* (citation and internal quotation marks omitted).

Our prior-panel-precedent rule requires subsequent panels of the court to follow the precedent of the first panel to address the relevant issue, "unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."  *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001).  Under the prior-panel-precedent rule, we must follow the reasoning behind a prior holding if we cannot distinguish the facts or law of the case under consideration— even if the present case does not involve precisely the same issue.  *See Smith*, 236 F.3d at 1301–04.

---

[11] We did not engage in the same analysis as did the Second Circuit in *First Fidelity*.  *See Aquamar*, 179 F.3d at 1299 n.42.  The *First Fidelity* Court analyzed the waiver under state agency law, but we applied federal and international law principles instead.  *Id.*  Nevertheless, we arrived at the same conclusion.  *Id.*

The *Aquamar* panel's reasoning applies with equal force to an inquiry into whether a purported foreign representative acted with actual or apparent authority when he engaged in the acts that satisfy the commercial-activity exception.  So *Aquamar*'s rule compels us to conclude that apparent authority suffices to waive FSIA immunity.

But even if actual authority were required, at this motion-to-dismiss stage of the proceedings, we find that Devengoechea alleged sufficient facts to establish actual authority.  As we have noted, resolution of a motion to dismiss requires the court to accept all factual allegations in the complaint as true and to view them in the light most favorable to the plaintiff.  *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).  When we review the complaint in that light here, Devengoechea has asserted sufficient facts that, if true, allow for the conclusion that the purported representatives of Venezuela acted with actual authority.

Among other such allegations, the Second Amended Complaint specifically avers that "Defendant Venezuela initiated commercial dealings with plaintiff . . . [and] met with plaintiff."  Second Am. Compl. at ¶ 5.  It also asserts a bit more specifically that "defendant's officials contacted plaintiff to arrange to meet plaintiff in Orlando," "defendant's representatives persuaded plaintiff to obtain a Passport[,] . . . and provided to plaintiff a letter of introduction[,]" and traveled

28

with Devengoechea and the Bolívar Collection to Venezuela. *Id.* at ¶¶ 6, 21. In addition, the complaint contends that the jet that Devengoechea was persuaded to board with the Bolívar Collection was Venezuela's jet. *Id.* at ¶ 7.

And more particularly, the complaint identifies as one of Venezuela's representatives who participated in these events "Delcy Rodriguez, Coordinator General of the Office of Vice President of Venezuela." *Id.* at ¶ 22. It further asserts that she and Alberto Arvelo were among "officials sent by the Venezuelan government." *Id.* The complaint also speaks in terms of negotiating "defendant Venezuela's prospective purchase" of the Collection. *Id.* at ¶ 23.

Sure, the purported Venezuelan officials could have been out on an unauthorized frolic when they took Venezuela's jet more than 1,500 miles to the United States, paid for Devengoechea's roundtrip ticket from Venezuela to Florida to pick up additional items from the Collection, arranged for Devengoechea to receive a Venezuelan letter of introduction to expedite the renewal of his passport, and engaged in negotiations for the purchase of the Bolívar Collection. But even assuming actual authority is required under the FSIA, the far more natural reading of these allegations—particularly when we construe them in the light most favorable to Devengoechea—requires us to conclude that Devengoechea sufficiently alleged that the purported Venezuelan officials acted with actual authority.

29

## B. *The Expropriation Exception*

Venezuela argues that FSIA's commercial-activity exception cannot apply to Devengoechea's claims because he has recast what are really expropriation claims as commercial-activity claims, and FSIA's expropriation exception does not provide for jurisdiction over Devengoechea's claims. We disagree with the first proposition, so we do not reach the second one.

FSIA's expropriation exception endows federal courts with jurisdiction in certain cases involving a foreign state's expropriation of property in violation of international law:

> (a)   A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3).

Under the expropriation exception, expropriation is a uniquely sovereign act, as opposed to a private act. Similar to the concept embodied in our Fifth Amendment to the U.S. Constitution, FSIA expropriation involves sovereign "takings" of property, without just compensation. *See Garb v. Republic of Pol.*,

440 F.3d 579, 584, 586 (2d Cir. 2006) (referring to the FSIA expropriation exception as the "'takings' exception"); *see also* Ernesto J. Sanchez, *The Foreign Sovereign Immunities Act Deskbook* 151 (Am. B. Ass'n 2014); *Expropriation*, *Black's Law Dictionary* (10th ed. 2014) ("A governmental taking or modification of an individual's property rights, esp. by eminent domain; CONDEMNATION").

So the expropriation exception is essentially an exception to the "restrictive theory of sovereign immunity" otherwise embodied in the FSIA, as it allows a plaintiff to obtain jurisdiction over a foreign state that has engaged in a public act. *See Helmerich & Payne*, 137 S. Ct. at 1321 ("A sovereign's taking or regulating of its own nationals' property within its own territory is often just the kind of foreign sovereign's public act (a '*jure imperii*') that the restrictive theory of sovereign immunity ordinarily leaves immune from suit[,] . . . and the expropriation exception provides that the general principle of immunity for these otherwise public acts should give way.").

Indeed, we have previously explained the sovereign nature of the act of expropriation under the FSIA. In *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326–27 (11th Cir. 2003), we held that Pakistan's actions in seizing the plaintiff's land in that country and using it for military purposes was not commercial activity but expropriation because it made use of the state's sovereign

31

authority at the time of the taking of the property in order to expropriate the property.

Other Circuits agree that for purposes of construing the FSIA, expropriation refers to only the state's use of its sovereign power to take property. For example, in *de Csepel*, 714 F.3d at 600, the District of Columbia Circuit acknowledged that "expropriation constitutes a quintessentially sovereign act falling outside the scope of the commercial activity exception." (citation, internal quotation marks, and alterations omitted). And the Second Circuit has described FSIA expropriation as "a decidedly sovereign—rather than commercial—activity." *Garb*, 440 F.3d at 586.

But here, Venezuela did not invoke any of its sovereign powers to obtain possession of the Bolívar Collection or to fail to return or pay for the Collection. Rather, as we have noted and Venezuela has conceded, Venezuela engaged in only commercial activity in this case.

Since it cannot argue factually that the expropriation exception applies here, Venezuela instead insists that the expropriation exception applies because Devengoechea's original Complaint alleged a count of expropriation in the alternative. Based on this fact, Venezuela essentially contends that Devengoechea is estopped from being able to claim that it did not engage in expropriation. But the Federal Rules of Civil Procedure allow a plaintiff to plead, without penalty, in

the alternative.  *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540 (11th Cir. 1986) ("Litigants in federal court may pursue alternative theories of recovery, regardless of their consistency.").

And "[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (internal citation omitted).  Once an amended pleading is filed, we look to the amended pleading to determine jurisdiction.  *Id.* Here, as we have explained, the Second Amended Complaint pleads sufficient allegations to establish that the commercial-activity exception is applicable, regardless of what other exceptions Devengoechea may have asserted in a prior pleading.

Nor do any direct factual contradictions or inconsistencies exist between Devengoechea's original complaint and the Second Amended Complaint.  True, the original Complaint did describe Venezuela's failure to return the Devengoechea Collection as a "clear act of expropriation of DEVENGOECHEA'S personal property in violation of international law."  But that allegation asserts a conclusion of law.  And calling an action expropriation does not make it expropriation as a matter of law.  Rather, as we have explained, FSIA

33

expropriation has a very precise meaning, and on this record, Venezuela's actions do not satisfy it. For that reason, this is not a case where a plaintiff recast what is truly an expropriation claim as a commercial-activity claim.

Finally, contrary to Venezuela's assertion, *Beg* does not demand—or even support—a different outcome. As we have noted, in *Beg*, Pakistan exercised its peculiarly sovereign powers to take the plaintiff's property and use it for military purposes. *See Beg*, 353 F.3d at 1325–27. In other words, Pakistan engaged in an "expropriation" within the meaning of that term under the FSIA. *See id.* at 1326 (explaining that expropriation "is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are"). So the *Beg* plaintiff could establish jurisdiction, if at all, only under the FSIA's expropriation exception. Here, however, unlike with Pakistan in *Beg*, nothing in the record supports the notion that Venezuela came into possession of or refused to pay for or return the Bolívar Collection through the exercise of its sovereign "takings" power. Rather, Venezuela acted in the same way that any private foreign buyer could have when it committed the acts that harmed Devengoechea.

## V.

Jurisdiction for Devengoechea's suit lies under the third clause of the FSIA's commercial-activity exception since his action is based on Venezuela's act outside the United States in connection with commercial activity, and that act had a direct

34

effect in the United States.  For this reason, we affirm the district court's order denying dismissal and remand for further proceedings.

**AFFIRMED.**